UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JASON MARTINEZ, :
                          Plaintiff, :
v. : **OPINION AND ORDER**
  :
STEVEN D'AGATA, MARK HESS, : 16 CV 44 (VB)
ANDREW FRANK, ANTHONY COSTALES, :
and SEAN GROGAN, :
                         Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

    Plaintiff Jason Martinez brings a Fourth Amendment claim against defendants Investigators Andrew Frank and Sean Grogan for failing to intervene while unnamed individuals used excessive physical force against plaintiff without justification. Plaintiff also asserts a Fifth Amendment claim against defendants Frank, Grogan, and Detective Anthony Costales (collectively, the "federal defendants"), and a Fourteenth Amendment claim against Detectives Steven D'Agata and Mark Hess (collectively, the "Liberty defendants"), for deliberate indifference to serious medical needs.

    Before the Court are motions for summary judgment filed by the federal defendants and the Liberty defendants. (Docs. ##103, 110).

    For the reasons set forth below, the federal defendants' motion is GRANTED, and the Liberty defendants' motion is DENIED.

    The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

    The parties submitted briefs, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background.

1

The federal defendants were members of the United States Marshals Service's New York/New Jersey Regional Fugitive Task Force when the events relevant to this action occurred. The task force is overseen by the United States Marshals Service, a federal agency. Its members are appointed Special Deputy United States Marshals, even though the members are employees of different state and local law enforcement agencies.

The Liberty defendants were members of the Village of Liberty Police Department when the events relevant to this action occurred.

I. Plaintiff's Arrest

Plaintiff, a registered level-two sex offender, moved from Liberty, New York, to his friend's home in Maspeth, Queens, in January 2015.

Thereafter, D'Agata of the Liberty Police Department provided Frank of the task force with a warrant authorizing plaintiff's arrest for failing to report a recent address change.[1] On February 18, 2015, Frank sent an e-mail to members of the task force seeking assistance to execute the arrest warrant the following day.

At least eight members of the task force participated in the operation to apprehend plaintiff. The group met at 5:30 a.m. on February 19, 2015, at the New York City Police Department's 104th Precinct, in Queens, and proceeded to plaintiff's friend's home at 52-24 71st Street in Maspeth, where plaintiff was staying with his family.

Plaintiff was arrested that morning.

A. Apprehension and Arrest

The parties offer differing accounts of plaintiff's arrest.

---

[1] Plaintiff claims he reported his change of address but also concedes the validity of the arrest warrant is not at issue here. (Doc. #119 ("Pl. Br.") at 31).

2

Plaintiff testified the task force members entered the home of Jaime Morales, plaintiff's friend, in search of plaintiff. According to plaintiff, two task force members—whom plaintiff described as a short, "bald", and "chubby" white man and a tall black man—went into the basement and handcuffed plaintiff. (Doc. #116 ("Sussman Aff."), Ex. 3 ("Pl. Dep.") at 55, 60–61).[2] The officers pushed plaintiff's head into a protruding pipe, and then proceeded with plaintiff upstairs toward the backyard. (Id. at 62). Plaintiff testified he was dragged from the house to a snow bank where the two task force members "pushed [his] face first into the snow bank" and struck him with a flashlight in the back of his head. (Id. at 68, 143). Plaintiff then was repeatedly "kicked in [his] groin area . . . until [he] started losing consciousness." (Id. at 71).

Morales testified he heard somebody "getting beat up downstairs" and indicated this occurred both inside and outside the house. (Sussman Aff. Ex. 2 ("Morales Dep.") at 58). Morales further testified he heard plaintiff's wife screaming and telling the officers to stop. (Morales Dep. at 61). Plaintiff's wife also testified plaintiff was screaming.

Defendants tell a different story. Members of the task force testified that they knocked on the door, waited two to five minutes and heard a door slam, and then someone opened the front door. According to the federal defendants, Frank, Costales, and three other task force members entered Morales's home after a brief conversation with one of the residents.

Grogan testified that as members of the task force went to the front door, he and task force member Canario attempted to access the back of the house but were unable to do so. Instead, Grogan and Canario proceeded to a residence three or four houses away from 52-24 71st

---

[2] "Doc. #__ at ECF__" refers to the page numbers automatically assigned by the Court's Electronic Case Filing system. "Pl. Dep. #__" refers to the to the page numbers in the top right of the transcript of plaintiff's deposition.

3

Street.  While Grogan could not recall seeing plaintiff prior to his arrest, he did recall Canario yelling stop at someone who was "four or five houses" away.  (Doc. #108 ("Krause Decl.") Ex. B ("Grogan Dep.") at 38).  When Grogan and Canario arrived at the place where the unidentified person had been standing, Grogan encountered a chain link fence and "obvious footprints."  (Id. at 41).  Kurzhals, another task force member, said he saw the suspect "running, but slowly. Limping, running."  (Krause Decl. Ex. E ("Kurzhals Dep.") at 40).  Eventually, Kurzhals caught up with plaintiff, drew his weapon, and told plaintiff to stop running and lay on the ground. Kurzhals then arrested plaintiff.[3]

According to Frank, plaintiff was apprehended "at a location several blocks away" from Morales's home.  (Doc. #105 ("Frank Decl.") ¶ 6).  Frank drove over to the site of plaintiff's arrest and saw plaintiff lying in a snow bank.  Frank observed plaintiff was "bleeding from the bottom of his feet."  (Krause Decl. Ex. A ("Frank Dep.") at 36).   Frank testified he drove plaintiff back to the house before leaving for the 104th Precinct.

Plaintiff, however, denies any attempt to flee and maintains he did not jump over any fence.  (Pl. Dep. at 33).  Plaintiff testified that the officers who drove him to the 104th Precinct were the same officers that beat him up.  However, both Frank and Grogan state that they did not see plaintiff until after he was arrested by Kurzhals, and Frank said plaintiff later apologized for running from the house.

B.  Transport to the Precinct

A task force member had called for medical assistance to respond to Morales's home and subsequently redirected the ambulance to the 104th Precinct.

---

[3]  Kurzhals testified Grogan and Canario appeared after he had apprehended plaintiff, but he could not recall who helped him place handcuffs on plaintiff.  (Kurzhals Dep. at 44–45).

Frank and Grogan transported plaintiff to the precinct, five minutes from 52-24 71st Street. Plaintiff testified he was unconscious during the ride, vomited on his shirt, experienced pain in his groin, and had difficulty breathing. Frank and Grogan recalled plaintiff's heavy breathing but attributed it to the fact that plaintiff had just been running. (Frank Dep. at 48–50). Plaintiff did not request medical care during this drive.

II.  Medical Treatment at the 104th Precinct

At 6:28 a.m., emergency medical technicians ("EMTs") Edith Moog and Siewnarine Persad of the New York City Fire Department treated plaintiff at the precinct. The medical evaluation lasted approximately thirty minutes and included checks of plaintiff's breathing, skin, temperature, and vitals, as well as head-to-toe and neurological assessments. The EMTs also applied wound dressings. The EMTs did not perform any exam that involved palpating any body parts, which they would do only when an individual makes a specific complaint of injury. Nor did the EMTs remove plaintiff's clothing because standard practice is to not remove a patient's clothing unless the patient asked for them to do so or they had express permission.

According to the EMTs' report, plaintiff suffered "soft tissue injuries." (Krause Decl. Ex. Q at ECF 2). Plaintiff did not tell the EMTs that he suffered an injury to his groin area, and he declined to be transported to a hospital for further medical treatment. However, plaintiff refused to sign a document stating that he declined medical treatment.

The federal defendants were present during the EMTs' evaluation.

III.  Transfer of Custody

Frank and Grogan brought plaintiff to the Sex Offender Management Unit ("SOMU") at 100 Centre Street in Manhattan. Plaintiff did not request medical treatment during the drive

5

from Queens to Manhattan. Around 6:30 a.m., Frank called D'Agata to inform him they had plaintiff in custody.

Frank and Grogan turned plaintiff over to Costales at SOMU. Plaintiff testified he spoke with only one law enforcement officer, an individual he described as "short, chubby, maybe like my height [5'6"], real chubby." (Pl. Dep. at 102). Plaintiff claims he told that officer—whom he identifies as Costales—he was in pain and required medical attention, and that his request was denied. Plaintiff testified he did not get medical attention at SOMU and was told he could go to the hospital after he was released.

Plaintiff's physical description of the law enforcement officer whom he identifies as Costales does not match Costales's description of himself. Costales claims he is six feet and two inches tall. (Doc. #108 ("Costales Decl.") ¶ 3). Moreover, Frank, Grogan, and Costales all testified that they each spent no more than fifteen minutes at SOMU.

IV. Transport to Liberty

Plaintiff remained at SOMU from 7:30 a.m. to about 8:00 p.m., when he was picked up by Liberty Police Department Detectives D'Agata and Hess. The Liberty defendants drove plaintiff to Liberty, New York, approximately a two-hour drive. During the drive, plaintiff asserts he asked to be taken to the hospital, but that request was denied. The Liberty defendants dispute this assertion and maintain they asked plaintiff if he wanted to go to the hospital, but that plaintiff declined. (Doc. #112 ("Varga Decl.") Ex. K ("D'Agata Dep.") at 49). The Liberty defendants drove plaintiff to the Liberty police station.

At the police station, the Liberty defendants read plaintiff his Miranda rights and interviewed plaintiff. Before the interview began, however, plaintiff "said he was in pain, and he pointed to his abdominal stomach area" and "lifted his shirt," at which point the Liberty

6

defendants saw plaintiff's bruises. (Varga Decl. Ex. L ("Hess Dep.") at 42). The Liberty defendants then interviewed plaintiff for approximately twenty-seven minutes.

The Liberty defendants assert that after plaintiff showed them his bruises, plaintiff told them he would see a doctor after he was released from custody. However, plaintiff insists he asked for medical care and his request was denied.

V.      Medical Attention

After about an hour at the police station, plaintiff was transferred to the Sullivan County Jail, arriving after midnight on February 20, 2015. There, it was determined plaintiff should be transferred to Catskill Regional Medical Center for treatment. According to an admission note at Catskill Regional Medical Center, plaintiff "injured his toes while attempting to elude the police while barefoot" and the injuries to his "groin, back, and right hand were the result of the physical altercation with the police." (Krause Decl. Ex. R at ECF 6).

At 8:56 a.m. that same morning, plaintiff was transferred and admitted to Albany Medical Center, where he was diagnosed with rhabdomyolysis, a right groin hematoma, and an injury to his right testicle. (Krause Decl. Ex. R at ECF 3). The urologist, Dr. Robert C. Welliver, indicated "[b]y the time we were consulted, the testis was not viable as it had been well over 4 hours since his injury." (Krause Decl. Ex. R at ECF 4). Plaintiff remained at Albany Medical Center until February 24, 2015, after which he was transferred back to Sullivan County Jail.

Plaintiff's right testicle returned to normal blood flow by March 9, 2015. (Krause Decl. Ex. S at ECF 2). Defendants' expert Dr. Arnold Melman attributed the healing to plaintiff's medical treatment being done "rapidly and appropriately." (Varga Decl. Ex. X at ECF 3). Plaintiff disputes this assessment.

# DISCUSSION

I.    <u>Legal Standard</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).[4]

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II.   Failure to Intervene Claim

   A.   Bivens Standard

The federal defendants argue the Supreme Court's recent decision in Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), precludes a private right of action under Bivens for failure to intervene when excessive force was used to effectuate an arrest, and that plaintiff's claim against them should therefore be dismissed.[5]

The Court agrees.

---

[5] Plaintiff argues the defendant task force members are not in fact federal defendants. The Court rejects this assertion. The task force members were appointed Special Deputy Marshals for the federal task force at the relevant times. The Court finds defendants Frank and Grogan were "acting in the capacity of a federal employee because of [their] involvement on the task force"; therefore, "Bivens is the appropriate jurisdictional basis for this action." Aikman v. Cty. of Westchester, 691 F. Supp. 2d 496, 499 (S.D.N.Y. 2010). See also Ochoa v. Bratton, 2017 WL 5900552, at *6 (S.D.N.Y. Nov. 28, 2017); Hester-Bey v. Donaruma, 2017 U.S. Dist. LEXIS 43378, *8 (E.D.N.Y. Mar. 23, 2017).

"For a plaintiff to enforce his constitutional rights he must have a cause of action. That is, there must be a statute passed by Congress or a judicially implied claim for relief." Rivera v. Samilo, 370 F. Supp. 3d 362, 366 (E.D.N.Y. 2019). Because plaintiff cannot identify a statute to prosecute this action, the question remains "whether there is a judicially implied claim for relief." Id.

"In Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court recognized an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016). Specifically, the Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. Rivera v. Samilo, 370 F. Supp. 3d at 366 (discussing Bivens v. Six Unknown Narcotics Agents, 403 U.S. at 389, 397).

Since Bivens, the Supreme Court has recognized a damages remedy for constitutional violations in only two other contexts: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a congressman for firing his female secretary, Davis v. Passman, 442 U.S. 228, 99 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, Carlson v. Green, 446 U.S. 14 (1980).

Recently, the Supreme Court emphasized that "[t]hese three cases—Bivens, Davis, and Carlson—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." Ziglar v. Abbasi, 137 S. Ct. at 1855. The Abassi Court expressed the need for restraint in expanding the Bivens remedy to additional contexts and cautioned that courts should not imply rights and remedies pursuant to Bivens as a matter of

course. Id. at 1856–57. Indeed, "the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity." Id. at 1857.

The Supreme Court set out a two-step inquiry for courts to determine whether to infer a Bivens cause of action in a new context or against a new category of defendants. "First, the court must determine whether a plaintiff's claims arise in a new Bivens context." Rivera v. Samilo, 370 F. Supp. 3d at 367. "If the case is different in a meaningful way from previous Bivens cases decided by [the Supreme Court], then the context is new." Ziglar v. Abbasi, 137 S. Ct. at 1859. The Court provided some examples of ways in which a case "might differ in a meaningful way" including:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusions by the Judiciary into the functioning of other branches; or the presence of special factors that previous Bivens cases did not consider.

Ziglar v. Abbasi, 137 S. Ct. at 1860.

"Second, if the claim arises in a new context, a court must consider whether there are special factors counseling hesitation in creating a Bivens remedy." Ramirez v. Tatum, 2018 WL 6655600, at *5 (S.D.N.Y. Dec. 19, 2018) (citing Ziglar v. Abbasi, 137 S. Ct. at 1857), reconsideration denied, 2019 WL 2250339 (S.D.N.Y. May 24, 2019). "The question of what special factors counsel hesitation 'must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action or proceed.'" Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1857–58). "Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1858). "[I]f there is an alternative remedial structure present in a certain case, that alone may

11

limit the power of the Judiciary to infer a new Bivens cause of action." Ziglar v. Abbasi, 137 S. Ct. at 1858).

Few courts in this Circuit have considered a plaintiff's Bivens claim for excessive force in effectuating an arrest with a warrant post-Abassi. In Lehal v. Cent. Falls Det. Facility Corp., 2019 WL 1447261, at *11 (S.D.N.Y. Mar. 15, 2019), a district court reasoned that because the case "directly involved a Fourth Amendment claim that the arresting federal agents had used unreasonable force in arresting the plaintiff" the claim did not present a new Bivens context. Next the Lehal court found several other Abbasi factors similarly weighed in favor of this determination such as the type of federal officers (i.e., arresting agents), who carried out the same type of official action, and the substantial judicial guidance as to the unconstitutionality of employing excessive force in the course of an arrest. Id. at *11. The Lehal court concluded it was not apparent that allowing plaintiff to proceed on excessive-force claims "would risk disruptive intrusion by the Judiciary into the functioning of other branches," or that such a finding would "erode legitimate distinctions between Fourth Amendment claims that fall within the contours of the Bivens decision and those that do not." Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1860).[6]

However, in Rivera v. Samilo, 370 F. Supp. 3d at 369, a district court performed a similar analysis on an excessive force claim involving DEA agents and refused to recognize a Bivens remedy for a "claim aris[ing] from the force allegedly applied in making a lawful street arrest." There, the court determined that the claim presented a new Bivens context, as it differed meaningfully from Bivens, notably that the arrest did not take place in plaintiff's home and

---

[6] The Lehal court did not reach a determination of whether defendants "could be held liable on a Bivens claim based on any alleged failure to intervene in the claimed use of force by [another defendant]." Lehal v. Cent. Falls Det. Facility Corp., 2019 WL 1447261, at *17.

therefore did not implicate plaintiff's privacy rights. Id. at 369. The court then found that special factors counseled against recognizing a new Bivens claim. Id. at 369–70.

Other courts have left open the question of whether excessive force and failure to intervene claims present a new Bivens context. See, e.g., Ojo v. United States, 2019 WL 3852391, at *13 (E.D.N.Y. Aug. 15, 2019), report and recommendation adopted, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); Johnson v. O'Connell, 2018 WL 5085702, at *13 (S.D.N.Y. Oct. 17, 2018).

B. Application

The Court declines to find a Bivens remedy for plaintiff's claim against the federal defendants for failure to intervene.

Concerning the first step in the new Bivens analysis, there is a meaningful difference between Bivens and plaintiff's allegations. First, the officers in this case operated under a different legal mandate than the officers in Bivens. Ziglar v. Abbasi, 137 S. Ct. at 1860. Bivens involved a warrantless arrest and search of the plaintiff's home, whereas this case involves an arrest made pursuant to a warrant, outside plaintiff's home. Second, the type of officers involved in Bivens were DEA agents, whereas here the officers were appointed members of a federal task force. Third, the Court in Bivens reasoned that the right at issue was primarily a Fourth Amendment right to privacy, Bivens v. Six Unknown Narcotics Agents, 403 U.S. at 389, whereas here the Fourth Amendment right plaintiff asserts is to be free from excessive force. And fourth, plaintiff's theory of liability is based on Frank and Grogan's alleged failure to intervene rather than the underlying excessive force violation.

As for the second step, special factors counsel hesitation in creating a new Bivens remedy. Plaintiff clearly had multiple alternatives to bringing a Bivens claim. Plaintiff could

have pursued his claim under the Federal Tort Claims Act ("FTCA"). See Rivera v. Samilo, 370 F. Supp. 3d at 369–70. In addition, he could have sought relief in state court. Id. at 370. Given these alternative remedial structures, the Court declines to infer a new Bivens cause of action for failure to intervene.

Accordingly, plaintiff's failure to intervene claim against Frank and Grogan fails as a matter of law.

III. Deliberate Indifference to Medical Needs Claim

The federal and Liberty defendants argue plaintiff fails as a matter of law to establish a claim for deliberate indifference to medical needs.

The Court agrees with the federal defendants but disagrees with the Liberty defendants.

A. Legal Standard

Plaintiff was a pretrial detainee at the time of his arrest. Deliberate indifference to medical needs claims brought by pretrial detainees against state actors under Section 1983 are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment because "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'" Darnell v. Pineiro, 849 F.3d at 29 (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)). Likewise, deliberate indifference to medical needs claims brought against federal actors under Bivens are analyzed under the Fifth Amendment's Due Process Clause. Laurent v. Borecky, 2018 WL 2973386, at *4 (E.D.N.Y. June 12, 2018) (rejecting argument that a pretrial detainee's Fifth Amendment due process claim arises in a new Bivens context).

To succeed on a claim of constitutionally inadequate medical care, a plaintiff must make a sufficient showing of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-prong test comprising an objective prong and a mens rea prong. Darnell v. Pineiro, 849 F.3d at 29 ("the elements for establishing deliberate indifference under the Fourteenth Amendment [are] the same as under the Eighth Amendment"). Namely, plaintiff must establish "the challenged conditions were sufficiently serious," and defendants "acted with at least deliberate indifference to the challenged conditions." Id.

For the objective prong, a pretrial detainee must establish the challenged conditions "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

In the context of medical care, two inquiries determine whether a deprivation is objectively serious. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail "'to take reasonable measures' in response to a medical condition." Id. at 279–80 (quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994)).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d at 280. If the allegedly offending conduct "is a failure to provide

15

any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id. If the offending conduct is the "medical treatment given," however, "the seriousness inquiry is narrower." Id. When "the prisoner is receiving appropriate on-going treatment for his condition," and brings a "denial of medical care claim based on a temporary delay or interruption in treatment," courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the mens rea prong, a pretrial detainee must sufficiently show defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell v. Pineiro, 849 F.3d at 35. The mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

B. Application

Here, no reasonable juror could conclude Frank or Grogan deprived plaintiff of adequate medical treatment. Following plaintiff's arrest, Frank and Grogan brought him to the 104th Precinct, five minutes away, where plaintiff was immediately treated by the EMTs. The medical evaluation lasted approximately thirty minutes and included checks of plaintiff's breathing, skin, temperature, and vital signs, as well as head-to-toe and neurological assessments. The EMTs also applied wound dressings. Moreover, plaintiff does not allege he requested further medical attention during the two car rides with Frank and Grogan—from Morales's home to the precinct

16

and then from the precinct to SOMU. Further, plaintiff did not tell Frank or Grogan he suffered injuries to his groin and testicles.

Accordingly, the deliberate indifference claim against Frank and Grogan fails. The undisputed facts demonstrate Frank and Grogan provided plaintiff with adequate medical care.

Likewise, no reasonable juror could conclude Costales deprived plaintiff of adequate medical treatment. Costales, like Frank and Grogan, was present for the EMT evaluation at the 104th Precinct. Costales then took custody of plaintiff after he was transferred to SOMU. Although Costales stated he spent no more than fifteen minutes at SOMU, plaintiff claims he told an officer—whom he identifies as Costales—he was in pain and required medical attention, and that his request was denied. However, plaintiff's physical description of the officer he spoke to does not match Costales's description of his appearance.[7]

Thus, the record evidence does not support a finding that Costales deprived plaintiff of adequate medical care.

However, construing the facts and drawing all reasonable inferences in plaintiff's favor, the Court concludes that a reasonable juror could find that the Liberty defendants deliberately denied or unreasonably delayed plaintiff's medical treatment. First, plaintiff may be able to satisfy the objective prong. As a preliminary matter, the parties dispute whether the Liberty defendants offered plaintiff medical care at all. Moreover, there is evidence that plaintiff's condition was sufficiently serious. Even though defendants' expert, Dr. Melman, reported plaintiff's injuries were not permanent and have not prevented him from fathering a child, plaintiff has provided evidence, such as the contemporaneous statements of Albany Medical's

---

[7] Nor does plaintiff argue that he cannot identify the individual who allegedly deprived him medical care while at SOMU. Instead plaintiff insists he "spoke at SOMU with defendant Costales, though, at his deposition, he did not know this officer's name." (Doc. #117, ¶¶ 64–67).

Dr. Welliver, that the delay of more than four hours in treatment could have caused irreparable harm. Smith v. Carpenter, 316 F.3d at 186 (in a claim for "denial of medical care claim based on a temporary delay" courts look to "the severity of the temporary deprivation alleged by the prisoner.").

Second, plaintiff may be able to satisfy the mens rea prong as well. The Liberty defendants drove plaintiff from SOMU to Liberty, New York, two hours away. Plaintiff testified he repeatedly asked for medical attention and requested to be taken to a hospital. The Liberty defendants dispute this claim and insist they asked plaintiff if he needed to go to the hospital and he said no. Yet prior to his interview at the Liberty police station, plaintiff told the Liberty defendants "he was in pain, and he pointed to his abdominal stomach area" and "lifted his shirt," at which point the Liberty defendants saw the bruises. (Hess Dep. at 42). Plaintiff testified he told the Liberty defendants he was kicked in the groin. Nevertheless, the Liberty defendants held plaintiff for at least an hour and proceeded to conduct an interview with plaintiff, which lasted approximately twenty-seven minutes.

After the interview, instead of being taken for medical treatment, plaintiff was taken to the Sullivan County Jail. Shortly after he arrived at the jail, plaintiff was transferred to Catskill Regional Medical Center, and then on to Albany Medical Center for medical treatment. Thus, a reasonable juror could conclude that the approximately four hour window from when the Liberty defendants took custody of plaintiff at SOMU to when he was transferred to Sullivan County Jail constituted an unreasonable delay in medical care, and these defendants were deliberately indifferent to plaintiff's medical needs despite plaintiff's repeated complaints and visible injuries.

18

Accordingly, there is sufficient admissible evidence in the record from which a reasonable juror could conclude D'Agata and Hess were deliberately indifferent to plaintiff's medical needs.

IV. Qualified Immunity

The Liberty defendants argue they are entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996).

In the context of an inadequate medical care claim, "to establish their qualified immunity defense, the defendants must show that it was objectively reasonable for them to believe that they had not acted with the requisite deliberate indifference." Odom v. Kerns, 2008 WL 2463890, at *13 (S.D.N.Y. June 18, 2008) (citing McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004)).

Here, as explained above, there are genuine material issues of fact as to whether the Liberty defendants were deliberately indifferent to plaintiff's medical needs, and whether their decision to bring plaintiff to the police station for questioning and then to jail rather than to a

hospital or for medical treatment constituted deliberate indifference. Thus, summary judgment in favor of the Liberty defendants on the basis of qualified immunity is inappropriate.

## CONCLUSION

Defendants Frank, Grogan, and Costales's motion for summary judgment is GRANTED.

Defendants D'Agata and Hess's motion for summary judgment is DENIED.

Plaintiff's Section 1983 Fourteenth Amendment claim against D'Agata and Hess for deliberate indifference to medical needs will proceed. Plaintiff's claims against Frank, Grogan, and Costales are dismissed.

**The Court will conduct a status conference on January 27, 2020, at 2:30 p.m. at which time the Court will set a trial date and a schedule for pretrial submissions. To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this case, the parties, prior to that date, are directed to discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conduct all further proceedings, including trial, before the assigned Magistrate Judge**.

The Clerk is instructed to terminate the motions. (Docs. ##103, 110).

Dated: December 16, 2019
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge